**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT W. SHAVER, | ) CASE NO. 1:20-cv-2008 |
| Plaintiff, | ) |
| v. | ) JUDGE DAVID A. RUIZ |
| KILOLO KIJAKAZI, | ) |
| *Acting Comm'r of Soc. Sec.*, | ) **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) |

Plaintiff, Robert W. Shaver (Plaintiff), challenges the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security (Commissioner),[1] denying his application for Disability Insurance Benefits (DIB) Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 *et seq*. (Act). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

**I. Procedural History**

On January 19, 2019, Plaintiff filed his application for DIB, alleging a disability onset date of July 11, 2017 (R. 12, PageID# 280 Transcript (Tr.) 211). The State agency denied Plaintiff's application initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 141-3, 145-51, 152-53). Plaintiff participated in the hearing on July 31, 2019, was represented by a non-attorney representative, and testified. (Tr.

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d).

64-94). A vocational expert (VE) and a witness, Russell Hagemeyer, also participated and testified. *Id*. On August 16, 2019, the ALJ found Plaintiff not disabled. (Tr. 47-65). On July 7, 2020, the Appeals Council declined to admit evidence submitted after the hearing date regarding treatment beginning September 13, 2019, and denied Plaintiff's request to review the ALJ's decision, thereby allowing the ALJ's decision to constitute the Commissioner's final decision. (Tr. 1- 7). Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R.15, 17).

Plaintiff asserts the following assignments of error: (1) the ALJ's finding that Plaintiff did not satisfy the criteria of Listing 11.02 was not supported by substantial evidence and resulted in harmful error, (2) the ALJ committed harmful error when he failed to find Plaintiff's testimony credible and failed to include the opinions of the treating and examining sources in his RFC, and (3) the ALJ's RFC is not supported by substantial evidence resulting in an erroneous finding that Plaintiff could perform his past relevant work and an error in the Step Five analysis. (R. 15 PageID# 593).

## II. Evidence

**A. Relevant Medical Evidence**[2]

1. **Treatment Records**

Plaintiff experienced a syncopal episode in June 2017, resulting in a car accident. (Tr. 284). On June 26, 2017, Anjili Maroo, M.D., described Plaintiff having a "typical spell" in which she noted he "remained oriented with no seizure like acitivity[,] the "episode appeared

---

[2] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

2

neurocardiogenic with an early increase in HR [heart rate] and preserved blood pressure" and Plaintiff responded to fluids and a position change. (Tr. 284). Dr. Maroo increased Plaintiff's Florinef, encouraged him to continue to drink water and noted the importance of neurological evaluation due to "recent confusion" and "prior history of epilepsy." (Tr. 284).

Plaintiff had a consultative neurological examination with Norman T. Sese, M.D. on August 22, 2017, to evaluate syncopal episodes—following referral from Dr. Maroo. (Tr. 281). The doctor noted Plaintiff had a history of hypertension and presented with syncopal episodes, which started ten years earlier but were increasing in frequency, although he did not have an episode in the week prior. (Tr. 281). Plaintiff described such episodes as sometimes "coming out of the blue" and, other times, they are preceded by dizzy or lightheaded sensations. (Tr. 281). Plaintiff described episodes in which he "passed out twice but had spells of dizziness and lightheadedness spells almost every other day." *Id.* Dr. Sese initially diagnosed assessed Plaintiff with "syncope and collapse" and "dizziness and giddiness" and recommended an EEG. (Tr. 283). On August 29, 2017, Dr. Maroo noted that Mr. Shaver's spells were seizure related, and not syncope, "none of the medications that I am giving him are going to help him." (Tr. 281).

On September 28, 2017, Plaintiff had a 20-minute EEG, which Dr. Sese interpreted as unremarkable, and recommended Plaintiff undergo epilepsy monitoring and testing to determine if episodes were epileptic in nature. (*Id.*; Tr. 289*)*. On October 12, 2017, Dr. Sese noted documented Plaintiff's complaint of syncopal episodes that were increasing in frequency and a history of seizure activity that did not resolve with Florinef; he questioned the diagnosis of "syncope and collapse" and assessed Plaintiff as having seizures. (Tr. 278-79).

On October 26, 2017, Dr. Maroo described Plaintiff as having "done well intermittently" with "only…1 spell of syncope" in the two prior weeks, compared to "[i]n the two weeks prior,

3

he had at least 10 (combination syncope and presyncope)." (Tr. 277). Dr. Maroo observed Plaintiff's BP was 138/90. (Tr. 278). He diagnosed Plaintiff with autonomic dysfunction and recommended Plaintiff "start wearing compression hose at all time, keep levsin in his pocket", and continue to take medications. (Tr. 277-78).

On March 15, 2018, Dr. Maroo noted Plaintiff's continued episodes of neurocardiogenic syncope, while indicating that "he does have some trouble remembering to take the middle dose of midodrine." (Tr. 310). Dr. Maroo described Plaintiff as experiencing "severe autonomic dysfunction" and reiterated Plaintiff should not drive, he should increase florinef, and wear compression hose. (Tr. 310-320).

On July 12, 2018, Dr. Maroo sent Plaintiff to the emergency department for seizure like activity over several days. (Tr. 372, 375). Neurologic testing was unremarkable (Tr. 380), a CT of Plaintiff's brain demonstrated no evidence of acute intracranial process (Tr. 363-64), and a chest x-ray confirmed a normal cardiomediastinal silhouette (Tr. 365). A July 13, 2018 portable EEG showed "evidence of potential epileptogenicity in the left more than right front temporal regions. No EEG seizures were recorded. Seizure monitoring is needed in order to develop or modify treatment." (Tr. 367; *see also* Tr. 382-83). Subsequent continuous EEG monitoring from July 13-14, 2018 "is suggestive of bilateral cortical dysfunction maximum in the left frontal temporal region with epileptogenicty from the left and right frontotemporal regions. No EEG seizures were noted." (Tr. 369, *see also* Tr. 388-90). Hassan Alzoubi, M.D., diagnosed claimant with "seizure, recurrent." (Tr. 387).

On September 8, 2018, consultant Ashley Fuentes, D.O. examined Plaintiff and noted an unremarkable physical status examination. (Tr. 396-402). Plaintiff discussed his EEG and stated that he did not undergo an MRI because he lacked insurance. (Tr. 396). Plaintiff "believe[d] his

4

last seizure or passing out was yesterday morning[,]"and involved passing out and losing time, in addition to visual changes and headaches. *Id*. Dr. Fuentes described Plaintiff's diagnoses as neurocardiogenic syncope, autonomic dysfunction and epilepsy. (Tr. 397).

On October 25, 2018, neurologist Vineet Punia, M.D. M.S. diagnosed Plaintiff with focal epilepsy of fronto-temporal origin, undetermined laterality based on recent BEM recording and doubled Plaintiff's Levetiracetam (LEV) dosage. (Tr. 410). Dr. Punia asked Plaintiff to keep a seizure calendar and video any episodes. *Id*.

On January 15, 2019,[3] Dr. Punia noted Plaintiff "Still having aura and dialectic seizure" with frequency down to "2-3 times a week[;]" described Plaintiff's "passing out /(GTC) [generalized tonic-clonic (GTC)] episodes…remained the same – once a week on average." (Tr. 491). This remained consistent at follow-up appointments on April 23, 2019 and July 24, April 23, 2019 (Tr. 474, 487-88) and July 24, 2019 (Tr. 511-12). Dr. Punia added Oxcarbazepine in October 2019. (Tr. 478).

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

On February 9, 2018, State agency medical consultant Rannie Amiri, M.D., reviewed the record and concluded Plaintiff experienced epilepsy and syncope episodes, "[h]owever, he has been non-compliant with wearing compression stockings as advised, his doctor recommended a video EEG to rule out seizure disorder which has not been completed or scheduled at this time." (Tr. 99). Dr. Amiri opined Plaintiff had no exertional limitations, but should not climb ladders, ropes or scaffolds and he should avoid commercial driving, operating dangerous machinery and

---

[3] Dr. Punia registered Plaintiff in a drug study to treat focal epilepsy in January 2019, in addition to continuing Plaintiff's LEV. (Tr. 474, 487-488). Plaintiff stopped taking the study medication in March 2019, due to irritability side effects, while remaining on LEV, and Dr. Punia discharged Plaintiff from the study on April 23, 2019. (Tr. 473).

unprotected heights. (Tr. 100-01).

On June 7, 2018, State agency medical consultant Gerald Klyop, M.D., reviewed the record and concurred with Dr. Amiri's opinions. (Tr. 110-11).

Dr. Maroo completed a Physical Medical Source Statement form, which although undated,[4] provided a diagnosis of neurocardiogenic syncope, with symptoms of "syncope, concussion, pre-syncope and tachycardia." (Tr. 319). The doctor noted "findings and objective signs" were "witnessed, repetitive postural dizziness, presyncope, frank syncope with resultant traumatic injuries" and medications had not yet controlled the unpredictable spells. *Id.* In a series of checkmarks, Dr. Maroo opined plaintiff could stand for 10 minutes at one time, for a total of less than two hours and will need to take unscheduled breaks in an unpredictable pattern due to syncope. (tr. 320). Dr. Maroo concluded that Plaintiff would be off task 25% of the day, he had "good days" and "bad days", and his impairments were reasonably consistent with the described functional limitations. (Tr. 321). Dr. Maroo concluded "Robert has autonomic dysfunction. He passes out unpredictably. He cannot drive. He is at risk for concussion in the workplace setting." (Tr. 321).

On August 10, 2018, Dr. Maroo wrote a letter opining that "[Plaintiff] is not cleared to drive or be in his work environment, as he is still clinically unstable" (Tr. 394). Dr. Maroo stated that Plaintiff "continued to have spells and would pass out without warning several times a week" despite the use of three medications. "He has been recently hospitalized for worsening symptoms, and preliminary results are indicative of a seizure disorder." (Tr. 394).

On September 18, 2018, Dr. Fuentes opined "his syncopal and epileptic episodes are not

---

[4] The opinion is not dated. The document contains a fax stamp of March 28, 2018. (Tr. 319).

6

predictable and occur randomly. During his episodes, he has limitations with speaking, hearing, sitting, standing, walking, lifting, carrying, handling, and traveling." (Tr. 398).

On January 21, 2019, Dr. Punia completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical form). The doctor opined Plaintiff could never lift or carry, stating, "If patient should experience either an aura or seizure activity, patient could be at risk of self-injury due to sudden loss of consciousness. If Patient experiences a seizure, he typically passes out, may fall to floor. After the seizure, he is confused and may experience difficulty with speech." (Tr. 466). Dr. Punia opined Plaintiff could sit, stand, and walk up to eight hours per day, "As long as patient did not experience seizure activity. Post seizure activity would be limited." (Tr. 467). Dr. Punia opined Plaintiff could never reach overhead, push or pull bilaterally because should he experience seizure activity he "is at increased risk of self-injury due to possible sudden loss of consciousness." (Tr. 468). For this same reason, Dr. Punia opined Plaintiff could never use his feet bilaterally to operate foot controls, never climb stairs, ramps, ladders or scaffolds, never balance, stoop, kneel, crouch or crawl. (Tr. 468-69). Lastly Dr. Punia concluded Plaintiff could not be exposed to various environmental conditions, and could not be exposed to ">2/3" quiet (Library) noise or moderate (Office) noise" concluding that "The above conditions could potentially trigger either an aura and/or seizure if patient were exposed to one or all triggers." (Tr. 470).

On April 23, 2019, Dr. Punia advised Plaintiff: "no bathing, no swimming unsupervised, no driving, no use of heavy machinery, no use of sharp moving objects and avoid heights." (Tr. 478). On July 30, 2019 Dr. Punia completed a "Seizures Medical Source Statement" which combined a check-box style statement with "Per patient report" description of typical seizures and duration. (Tr. 518-521). Under "Can stress precipitate your patient's seizures?" Dr. Punia

indicated "unknown to this provider" while also checking" incapable of even "low stress work" (Tr. 519). Similarly, under "can exertion precipitate your patient's seizures?" Dr. Punia checked "unknown to this provider" and concluded Plaintiff could stand/walk about two hours, sit about six hours, and never lift any weight per Plaintiff's reports of seizures. (Tr. 520). Dr. Punia described Plaintiff's typical seizures, based on Plaintiff's reports and concluded "recommendation-no driving; no operation of heavy machinery with sharp moving parts; avoid heights (no climbing ladders/scaffolding); avoid heavy lifting; and any other activity in which brief loss of awareness/consciousness could pose a risk of injury to the plaintiff or others." (Tr. 518-19, 521).

**B. Relevant Hearing Testimony**

During the July 31, 2019 hearing, Plaintiff testified as follows:

- He lives with his spouse and nephew (Tr. 70), and has a driver's license that he last renewed two years before the hearing when he was told to stop driving. (Tr. 71).

- He attended one year of college, but did not obtain a degree. (Tr. 71-72). He worked for the Red Cross for seventeen years through July 1, 2017, starting as a technician and becoming an instructor around 2004. (Tr. 72-73). He "really didn't have to do much lifting, carrying"; he pulled carts from the truck but handled nothing more than 100 pounds. (Tr. 73-74).

- He experienced seizures at work and sometimes staff would call an ambulance. He explained that on his last day, someone took over "because I wasn't talking right. * * * when I left home that night, I ended up parked on a side street. I had no idea where I was at. * * * I was too afraid to drive after that so I made some phone calls." (Tr. 74-75).

- He has continuously received treatment since that date. He does not think much has changed, but he is having less Grand Mal Seizures—probably more than a couple times per month. He has petit mal seizures every day as witnessed by his husband. Signs include staring, confusion/disorientation. (Tr. 76).

- He currently takes Keppra, and stopped taking an experimental medication because it made him feel angry during the trial period. (Tr. 77).

- He tries to perform different tasks at home such as cleaning, laundry, and using an electric mower. (Tr. 78-79). He sometimes forgets what he has done and neighbors have found him in the yard. (Tr. 80). He does not prepare meals. (Tr. 79). Friends are able to come over to visit, but he does not go out often. *Id*.

- His medications cause him to feel tired. (Tr. 80). He uses alarms to remember to take his medications. He cannot sit still for the length of a 30-minute program. (Tr. 81).

- **Steven- please find the Cite for this quote: His doctor asked him to provide a seizure book, but "completely forgot about the book or if I have one, I didn't realize I had one. I had a couple of 'em in there because my husband will let me know * * * something major happen[ed] so I'd write that down but there's not much in there 'cause I just, honestly, You're Honor, I just couldn't remember."** (Tr. )

Plaintiff's husband, Russell Hagemeyer provided the following pertinent testimony:

- He lived with Plaintiff for the three years prior to the hearing, and witnessed Plaintiff's seizures, which vary in duration and type, with one or two per day. (Tr. 83). He witnessed Plaintiff occasionally black out, and indicated Plaintiff stares, becomes flushed, turns white, starts to sweat, bits his lips, fidgets with lips, and becomes disoriented. (Tr. 84). Plaintiff is usually out for a couple of minutes, but Mr. Hagemeyer has not timed them. *Id*. Plaintiff does not lose body function, and does not typically remember the seizure. (Tr. 85). He witnessed Plaintiff experience a period of disorientation, after the seizure, lasting from minutes up to half a day; while other times he may get up right away and start functioning. *Id*. Plaintiff also becomes disoriented with "blank stare seizures" and loses time. (Tr. 86).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

9

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

**IV. Summary of the ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.

2. The claimant has not engaged in substantial gainful activity since July 11, 2017, the alleged onset date (20 CFR 404.1571 *et seq*.).

> 3. The claimant has the following severe impairments: autonomic dysfunction, specifically neurocardiogenic syncope, and epilepsy (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: claimant can never climb ladders, ropes, or scaffolds; claimant can never work at unprotected heights, near moving mechanical parts, and never operate a motor vehicle.
>
> 6. The claimant is capable of performing past relevant work as an Instructor (DOT 097.221-010, SVP 7, light, performed as heavy). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from July 11, 2017, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 52-54, 57)

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ

failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. Listing 11.02**

In the first assignment of error, Plaintiff contends that the ALJ erred in finding Plaintiff did not meet or equal Listing 11.02. (R. 15 PageID# 600). The Commissioner responds that Plaintiff failed to meet his burden of establishing he met a Listing. (R. 17 PageID# 625-630).

Neurological disorders such as epilepsy may manifest in a combination of limitations in physical and mental functioning and are evaluated under Listing 11.00. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 11.00A.[5] The regulations specify the evidence considered when evaluating a claimant's neurological disorder:

> We need both medical and non-medical evidence (signs, symptoms, and laboratory findings) to assess the effects of your neurological disorder. Medical evidence should include your medical history, examination findings, relevant laboratory tests, and the results of imaging. Imaging refers to medical imaging techniques, such as x-ray, computerized tomography (CT), magnetic resonance imaging (MRI), and electroencephalography (EEG). * * * In addition, the medical evidence may include descriptions of any prescribed treatment and your response to it. We consider non-medical evidence such as statements you or others make about your impairments, your restrictions, your daily activities, or your efforts to work.

Listing 11.00B(1). Epilepsy must be documented by a detailed description of a typical seizure

---

[5] Hereinafter Listing 11.00 and relevant subpart.

12

and characterized as generalized tonic-clonic or dyscognitive. Listing 11.00H(1) and Listing 11.02 (Epilepsy).

An individual's epilepsy must result in limitations despite adherence to a prescribed course of treatment. The regulations explain such as having "taken medication(s) or followed other treatment procedures for [claimant's] neurological disorder(s) as prescribed by a physician for three consecutive months but [claimant's] impairment continues to meet the other listing requirements despite this treatment." Listing 11.00C. The record must contain "at least one detailed description of [claimant's] seizures from someone, preferably a medical professional, who has observed at least one of your typical seizures. If [claimant] experience[s] more than one type of seizure, we require a description of each type." *Id*. at Listing 11.00H(2).

Plaintiff contends that he experienced generalized tonic-clonic (GTC) seizures at least once a month for three months and dyscognitive seizures at least two to three times per week, satisfying the requirements of Listing 11.02A and 11.02B. Listing 11.02 provides, in pertinent part:

> 11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by ***:
>
> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).
>
> OR
>
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 11.02A and 11.02B. The period specified in Listing 11.02A or 11.02B cannot begin earlier than one month after Plaintiff begins treatment and must

13

occur within the period in connection with Plaintiff's application for disability insurance benefits. *Id*. at Listing 11.02H(4).

Here, the ALJ's underlying decision summarized Listing 11.02, and provided the following discussion:

> Claimant does not have detailed seizures documentation, and it was noted he had a seizure log in one record, but it was not provided to the doctor (9F/7; 12F/8; Testimony). In April 2019, claimant was taking part in a medication study, but stopped it due to irritability, and he was still having seizures but was unsure of the frequency (11F/3). Therefore, there is not sufficient evidence indicate claimant meets this Listing.

(Tr. 54).

The court finds that the ALJ's Step Three analysis of claimant's epilepsy is incomplete. Although the ALJ considered Plaintiff's seizure disorder, the decision did not apply the appropriate analysis set forth in the section 11.00H. Considering all the evidence in the record, *Walker*, 884 F.2d at 245; *Hubbard*, 2012 WL 883612, at *5, there are pertinent records and medical opinion evidence relevant to the analysis, but the ALJ did not assess them under the appropriate evaluative process.

The Commissioner's response that Plaintiff did not satisfy his burden is not well taken. Although the Commissioner contends Plaintiff lacked documentation of seizures and frequency and did not submit a log, the Listing does not require Plaintiff to submit such a calendar or log. (R. 17 PageID #628). Rather, the Plaintiff must supply evidence in the form of "at least one detailed description of your seizures from someone, preferably a medical professional, who has observed at least one of your typical seizures." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 11.00H(2). The Sixth Circuit has previously addressed this issue noting, "[f]urther, since there was no record of professional observation of one of Hicks' seizures, Hicks was required to

provide a detailed description of a typical seizure from someone other than himself." *Hicks v. Comm'r of Soc. Sec* 105 Fed.Apx 757, *761-762. (6th Cir 2004).[6] Here, Plaintiff presented the testimony of Mr. Hagemeyer, under oath, describing the signs of Plaintiff's seizures, consistent with both GTC and dyscognitive seizures as described in Listing11.00H and Listing 11.02.

Similarly, the Commissioner's assertion that Plaintiff failed to adhere to a prescribed course of treatment, by pointing to Plaintiff's withdrawal from a medication study, overlooks the fact he remained compliant with his prescribed medication, but discontinued the trial medication due to side effects and with the knowledge of Dr. Punia. (R. 17 PageID# 628 Tr. 473-74, 487-88, 511-12). Moreover, the Listing allows for good reasons to deviate from a prescribed course of treatment, such as an inability to afford such treatment. Listing 11.00H(d). Although Plaintiff did not undergo extended epilepsy monitoring, the record shows Plaintiff informed Dr. Fuentes that his insurance ended, a fact the ALJ did not evaluate to assess whether Plaintiff did not undergo epilepsy monitoring for the same reason. (Tr. 396). Additionally, while the record describes Plaintiff as generally compliant with his medication, Dr. Maroo, who treated him for Neurocardiogenic syncope, acknowledged as early as August 2017, that "none of the medications that I am giving him are going to help him" if he has seizures instead of syncope. (Tr. 281).

Further, the Commissioner's reliance on State agency reviewing physicians is misplaced. (R. 17 PageID # 630). Both Drs. Amiri and Klyop described Plaintiff's condition as neurocardiogenic syncope, autonomic dysfunction, and "possible epilepsy" (Tr. 96, 106). While

---

[6] The Social Security Administration revised the listings for Neurological Disorders for all cases filed or pending after September 29, 2016. 81 Fed. Reg. 43048, amended 82 FR 39664. Although the *Hicks* court relied on a prior version of Listing 11.02, the current version does not require that such a detailed description must be from only medical professionals.

15

they concluded epilepsy was a secondary severe impairment, they described Plaintiff's symptoms as "syncope episodes" and not seizures. (Tr. 98-99, 99-100). Indeed both physicians opined that Plaintiff's impairment did not satisfy the requirements of Listing 11.02, but they qualified their opinions because Plaintiff had not yet undergone video EEG testing on the epilepsy monitoring unit. (Tr. 100, 111).

As Plaintiff highlights, however, he received continuous EEG monitoring from July 13-14, 2018, after seeking emergency treatment at the behest of his cardiologist. (R. 15 PageID# 601-01). The EEG record indicates it "is suggestive of bilateral cortical dysfunction maximum in the left frontal temporal region with *epileptogenicity* from the left and right frontotemporal regions. No EEG seizures were noted." (Tr. 369) (emphasis added); *see also* Tr. 388-90). At that time, Hassan Alzoubi, M.D., diagnosed claimant with "seizure, recurrent." (Tr. 387). These records support Plaintiff's epilepsy claim, but were not considered by the State agency consultants se they occurred after their review of the record, and the ALJ's decision fails to discuss them in connection the Step Three analysis. Consequently, the ALJ's decision failed to sufficiently assess whether Plaintiff experienced neurocardiogenic syncope from his alleged onset date or epilepsy with seizure activity.

Therefore, the case is remanded for a more thorough evaluation of Plaintiff's alleged seizure disorder at Step Three, consistent with the pertinent regulations. *See generally Standen* v. *Colvin, Acting Comm'r of Soc. Sec*. 2016 WL 915254, at *3-*4; *Walker v. Colvin, Acting Comm'r of Soc. Sec*, 2015 WL 13217098, at *7. Although the case is remanded, nothing in this decision should be construed to express any view regarding the merits of Plaintiff's claim(s) and whether the record demonstrates a disability under the governing regulations and applicable legal standards.

Finally, the Court finds Plaintiff's second and third assignments of error are moot, but the Commissioner will have an opportunity to consider Plaintiff's claims upon remand.

### VI. Conclusion

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

IT IS SO ORDERED.

*s/ David A. Ruiz*
David A. Ruiz
United States District Judge

Date: September 27, 2022